PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CLIFFORD J. QUINN,
*Defendant-Appellant.*

No. 02-4753

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JAN P. BLANTON,
*Defendant-Appellant.*

No. 02-4762

Appeals from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CR-00-275-AW)

Argued: December 3, 2003

Decided: March 4, 2004

Before MICHAEL, TRAXLER, and SHEDD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Shedd wrote the opinion in which Judge Michael and Judge
Traxler joined.

## COUNSEL

**ARGUED:** Robert Charles Bonsib, MARCUS & BONSIB, Greenbelt, Maryland, for Appellant Quinn; Michael Joseph, BLANK ROME, L.L.P., Washington, D.C., for Appellant Blanton. Bonnie S. Greenberg, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Alex Blanton, BLANK ROME, L.L.P., Washington, D.C., for Appellant Blanton. Thomas M. DiBiagio, United States Attorney, Sandra Wilkinson, Assistant United States Attorney, Greenbelt, Maryland, for Appellee.

## OPINION

SHEDD, Circuit Judge:

A grand jury indicted Clifford Quinn, Jan Blanton, and Christopher Beisler on two counts of soliciting a bribe, three counts of conflict of interest, two counts of "honest services" wire fraud, and one count of conspiracy to defraud the government. Beisler pled guilty and agreed to testify against Quinn and Blanton. After a three-week trial, the jury found Quinn guilty on all counts and Blanton guilty on all counts but one. The district court sentenced Quinn and Blanton each to 87 months' imprisonment and a $15,000 fine. Quinn and Blanton timely appealed, challenging their convictions on the two bribery counts and their sentences. For the reasons that follow, we affirm the convictions but vacate the sentences and remand the case for resentencing.

I.

From 1994 to 1998, Blanton served as Director of the Executive Office for Asset Forfeiture ("EOAF"), the agency within the Department of the Treasury responsible for administration of the Treasury Forfeiture Fund.[1] Various law enforcement agencies within the Trea-

---

[1]Because Quinn and Blanton appeal from judgments of conviction, we view the facts in the light most favorable to the government. *See United States v. Glasser*, 315 U.S. 60, 80 (1942); *United States v. Burgos*, 94 F.3d 849, 862-63 (4th Cir. 1996).

sury Department deposit non-tax forfeited assets into this fund. Among other things, the monies deposited in the Treasury Forfeiture Fund may be used to finance internal EOAF projects. In the spring of 1997, Blanton hired her paramour, Quinn, to oversee the operation of EOAF's asset forfeiture tracking systems. Shortly after assuming his duties at EOAF, Quinn requested and Blanton approved a no-bid contract for Quinn's friend Beisler to repair a computer system that had been installed only a month earlier. Quinn set the price of this contract at $50,000; Beisler completed the work in two nights.

At about the same time, Quinn began discussing with Beisler a business venture, later known as Equus, to develop asset tracking software for use by federal, state, and local law enforcement agencies. State and local law enforcement agencies may make claims against the Treasury Forfeiture Fund for shares of certain forfeited assets held in the fund, and Quinn asked Beisler to write software for Equus that would allow state and local officials to manage their asset tracking information requests to the federal government. Quinn suggested that the new business be funded by monies that Beisler would receive from EOAF contracts. While Quinn and Beisler maintained this prospective business arrangement, Quinn and Blanton approved two more no-bid contracts for Beisler, one for $50,000 and another for $24,500.

Shortly after Beisler began his work at EOAF, Quinn began discussing his goal of fully automating the office. Quinn's experience in government offices convinced him that the existing programs were wasteful and inadequate. At the same time, Quinn saw an opportunity to profit from his Equus applications. According to Beisler, Quinn estimated that they could make between $30 million and $60 million from Equus once the EOAF office was fully automated. Quinn could "wire up these contracts" so Beisler would do the work; Quinn would then quit his government job and go to work for Beisler.

In July and August 1997, Quinn and Blanton approached Counter Technology, Inc. ("CTI") to discuss a contract for the full automation of the EOAF system. At a July 24 meeting, Quinn presented a business plan for a joint venture between CTI and Equus. This presentation included slides describing potential applications of Equus software to EOAF functions and prices for Equus products. The pric-

ing schedule made reference to fully automated versions of Equus products designed to interact with "mirror capabilit[ies]" at EOAF and other government agencies. Quinn's presentation also covered the estimated costs of the EOAF automation project. A week after this initial meeting, Quinn faxed CTI a letter proposing a "joint venture between Equus and CTI" to market the new software. Equus would produce the software and provide technical expertise, while CTI would handle marketing. Quinn stated that EOAF intended to award a contract for development of an automated system in October 1997; he further proposed that he "manage this effort from the private sector."

Quinn and Blanton subsequently had dinner at the home of CTI's principals. At this meeting, Quinn again promoted his Equus software and Blanton indicated that she wanted to award a no-bid contract to CTI for the automation of the EOAF system. Blanton told CTI that this contract would be worth more than $4 million and that she would structure the deal in a manner that would satisfy applicable contracting rules.

A few days after this dinner meeting, Quinn faxed CTI another document indicating specific terms for the proposed joint venture. Quinn proposed that he "come to work as an employee of CTI with a base salary of $125,000; management of any federal procurement utilizing the design of any of the Equus packages; . . . 40% of the net revenues of any procurement utilizing the Equus applications; personnel authority over any application managed; [and] management of any application as a profit center with performance bonuses tied to profitability." In a subsequent telephone conversation with one of CTI's principals, Blanton stated that she wanted Quinn to be the project manager for the automation project once CTI was awarded the contract. Blanton told one CTI official that CTI needed to hire Quinn so she could "sustain her lifestyle."

Hoping to avoid a conflict with Blanton, CTI made no response concerning the automation contract. CTI soon learned that Blanton was removing CTI employees from work details at EOAF and complaining to other government officials about CTI's work. When another government official asked CTI what was causing these new complaints, a CTI representative suggested that Blanton was upset

because CTI was dragging its feet on the automation contract proposal. Blanton did not award the automation contract to CTI.

Blanton continued her search for a contractor to automate the EOAF office. In September 1997, she approved a procurement request for the automation project, then valued at $10 million. Quinn and Blanton specifically requested that Beisler perform the automation work. In response to this request, Treasury Department procurement officers advised Quinn and Blanton that once a contractor was selected, they could only suggest that Beisler be hired as a subcontractor on the project; it would be left to the discretion of the contractor to determine whether Beisler would be involved. With Blanton's approval, West Electronics ("West") was selected to be the prime contractor. Quinn and Blanton continued to press for Beisler's participation in the project, urging procurement officers to make certain that Beisler was made the project manager on West's project.

West entertained a bid from Beisler for a subcontract. Beisler initially submitted a bid proposing that he receive about 80% of the $10 million contract. West rejected this bid, noting that applicable contracting rules capped any subcontractor's share at 49% of the contract price. Beisler complained to Quinn that West was not likely to pay him more than about $2 million for his work on the project. Quinn responded, "I'm not doing this contract for no $2 million." Beisler revised his bid to reflect the 49% cap, but West still refused to do business with him. West went to the Treasury Department procurement officers handling the project to find out whether West had any obligation to use Beisler. Shortly after West indicated that it was not likely to engage Beisler, Blanton announced that she no longer wanted West to handle the project. One of the procurement officers in charge of the project attempted to persuade Blanton that West was capable of performing the contract, but Blanton was unmoved. The offer to West was withdrawn.

II.

Quinn and Blanton were convicted on two counts of soliciting a bribe, in violation of 18 U.S.C. § 201(b)(2), which states that "[w]hoever . . . being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives,

accepts or agrees to receive or accept anything of value personally or for any other person or entity, in return for: (A) being influenced in the performance of any official act; (B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or (C) being induced to do or omit to do any act in violation of the official duty of such official or person" shall be fined or imprisoned, or both, and disqualified from holding federal office.

Quinn and Blanton seek to set aside their bribery convictions on the grounds that (1) the indictment failed to allege with sufficient particularity the facts underlying the bribery counts, (2) the district court improperly instructed the jury on the elements necessary for conviction on the bribery counts, (3) the evidence was not sufficient to support convictions on the bribery counts, and (4) the district court improperly permitted the government to elicit testimony concerning Quinn's refusal to answer certain questions during an internal Treasury Department investigation.

A.

Quinn and Blanton first contend that the indictment failed to allege with sufficient particularity that they intended to effect an exchange of a specific payment for specific official action. Because Quinn and Blanton did not object to the sufficiency of the indictment in the district court,[2] we review this claim for plain error. *See United States v. Cotton*, 535 U.S. 625, 631 (2002) (applying plain error analysis to a claim that the indictment failed to allege an element of the charged offense). Under this standard of review, reversal is not warranted unless we find a plain error that affects substantial rights and seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

---

[2]Quinn and Blanton moved the district court for a bill of particulars, seeking more specific information concerning the bribery counts. Because a bill of particulars cannot cure a deficient indictment, *United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988) (*en banc*), we conclude that seeking this remedy — without objecting to the sufficiency of the indictment — does not preserve for review an alleged defect in the indictment.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). *Accord United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002). While it is generally sufficient that the indictment describes the offense by using the unambiguous language of the statute, that general description "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117-18. *See also Russell v. United States*, 369 U.S. 749, 765 (1962) (noting that an indictment must "descend to the particulars" where the definition of an offense includes generic terms). "Thus, the indictment must also contain a 'statement of the *essential facts* constituting the offense charged.'" *Brandon*, 298 F.3d at 310 (quoting Fed. R. Crim. P. 7(c)(1)).

Our consideration of these standards is tempered by the absence of an objection to the indictment before the verdict was rendered. Rejecting a challenge to the sufficiency of an indictment, we stated in *United States v. Vogt*, 901 F.2d 1184 (4th Cir. 1990), that "[w]hen a post-verdict challenge to the sufficiency of an indictment is made, every intendment is then indulged in support of . . . sufficiency." *Id.* at 1201 (internal quotations omitted). As to the factual allegations, we ask whether "the necessary facts appear in any form, or by a fair construction can be found" within the indictment. *Id.* (internal quotations omitted). As to the elements of the offense, "the indictment will be held sufficient if it contains words of similar import." *Id.* (internal quotations omitted).

Section 201(b) makes it illegal for a government official corruptly to solicit "anything of value personally or for another person or entity, in return for" being influenced in the performance (or non-performance) of some official act. 18 U.S.C. § 201(b)(2)(A). "[F]or bribery there must be a *quid pro quo* — a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999). We have stated that the government is not required in a bribery case to prove "an expressed intention (or agreement) to engage in a quid

pro quo." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). Nor must the government prove "that the defendant intended for his payments to be tied to specific official acts (or omissions). . . . Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action." *Id.* In other words, "[t]he quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." *Id.* (internal quotations omitted). Although the defendant in *Jennings* was the payor rather than the government official, these standards apply with equal force in the solicitation context. Thus, an indictment charging solicitation of bribery in violation of § 201(b) should allege that (1) the defendant was a government official, (2) who sought something of value from another person, (3) in exchange for favorable official action or inaction by the defendant.

After reciting the language of § 201(b), Count Four of the indictment charged that Quinn and Blanton "sought from CTI benefits for Equus, Clifford J. Quinn and Christopher F. Beisler in return for favorable consideration and recommendation on specified future contracts with the Treasury Department." Count Four also incorporated paragraph 23 of the indictment, which alleged that Quinn and Blanton "would solicit employment and other financial benefits from third parties in exchange for offering to award future potential government contracts." Count Seven likewise recited the language of the statute and then charged that Quinn and Blanton "sought from West Electronics benefits for Christopher F. Beisler in return for favorable consideration and recommendation on a contract with the Treasury Department." Count Seven also incorporated paragraph 24 of the indictment, which alleged that Quinn and Blanton "would attempt to funnel money through West Electronics to [Beisler] by offering to award a government automation contract on the condition that the third party pay Beisler to perform much of the contract work."

These allegations, taken together, identify the relevant parties and the purported quid pro quos.[3] Count Four put Quinn and Blanton on

---

[3]Blanton contends that Count Seven is defective because it fails to allege any misconduct by her specifically. This argument is meritless. Not only is Blanton named in Count Seven, but she is also specifically named in paragraphs 24 and 25 of the indictment, which were incorporated into Count Seven by reference. Thus, Count Seven charged an offense against Blanton as well as Quinn.

notice that they were charged with seeking from CTI direct compensation to Quinn (in the form of employment) in exchange for favorable consideration on a government contract. Count Seven put Quinn and Blanton on notice that they were charged with seeking from West a lucrative subcontract for Beisler in exchange for favorable consideration on a government contract. These allegations are sufficiently specific to bar a future prosecution for the same offenses. We conclude that Counts Four and Seven of the indictment adequately alleged violations of § 201(b), and it was not plain error to enter judgments of conviction against both Quinn and Blanton on these counts.

### B.

Quinn and Blanton next contend that the district court's instruction on the bribery counts was inadequate because it (1) failed to require the jury to find that they sought a specific payment in return for a specific official act, and (2) allowed the jury to convict them even if they acted as they would have absent a bribe. The district court instructed the jury as follows:

> And the final element to the bribery section, Counts 4 and 7, the third element that the government must prove beyond a reasonable doubt is that the defendant demanded, sought or received a thing of value with the corrupt intent of being influenced in the performance of an official act.

> Corrupt intent means simply having an improper motive or purpose. The defendant must have demanded, sought or received a thing of value with the deliberate purpose of being influenced in the performance of his or her official duties. This involves conscious wrongdoing or, as it is sometimes expressed, a bad or evil state of mind. An official act means any decision or action on any question or matter which may at any time be pending or which may by law be brought before any public official in his or her official capacity or in his or her place of trust.

> The official act as to Count 4 in this case was relating to CTI in return for favorable consideration and recommendation on specified future contracts with the Treasury Depart-

ment. And for Count 7 this related to West Electronics in
return for favorable consideration and recommendation on
a contract with the Treasury Department.

As an initial matter, the record shows — and Quinn and Blanton
do not dispute — that the district court's instruction on this issue was
precisely the instruction that they requested.[4] Thus, to the extent that
Quinn and Blanton challenge the affirmative statement of the ele-
ments of the offense, any error committed by the district court in giv-
ing this instruction was invited error and is not subject to review. *See
United States v. Herrera*, 23 F.3d 74, 75-76 (4th Cir. 1994).[5]

Invited-error analysis does not apply, however, to the claim that the
district court improperly instructed the jury that it could convict
Quinn and Blanton even if their conduct was not actually altered by
the purported bribe. The district court instructed the jury as follows:

It is not a defense that the official act sought to be influ-
enced would have been done anyway regardless of the fact

---

[4]Quinn and Blanton did request that a single sentence be added to the
end of the instruction, but that request concerned an issue wholly unre-
lated to the defendants' complaint on appeal. The defendants requested
the instruction that was given and never suggested that the instruction be
altered to reflect the interpretation of the quid pro quo requirement that
they now advance.

[5]In any event, we note that the defendants' argument on this point is
substantially the same as their argument on the sufficiency of the indict-
ment: Conviction under § 201(b) requires proof of specific payments
influencing specific official actions. *Jennings* does not require the partic-
ularity that the defendants urge, with respect to either the indictment or
the proofs. Conviction under § 201(b) requires a finding that the defen-
dant sought something of value *in exchange for* performance (or non-
performance) of some official action. *Jennings*, 160 F.3d at 1014. Thus,
we held in *Jennings* that a jury instruction failed to describe the quid pro
quo requirement where there was no mention of payment made *in
exchange for* official action. 160 F.3d at 1018-21. Because the district
court in this case instructed the jury that it must find that Quinn and
Blanton offered official action "in return for" financial benefits, we
would reject the defendants' challenge to this aspect of the jury instruc-
tions even if it were properly presented to us.

that the bribe was received or accepted. That is to say, even if the defendant acted as he or she normally would if the bribe had not been requested, the crime of bribery has still been committed.

The defendants did not request this instruction, and they did object to it. Accordingly, we review this instruction for abuse of discretion. *See United States v. Bolden*, 325 F.3d 471, 486 (4th Cir. 2003). The district court's instructions on this issue will be upheld "provided that the instructions, taken as a whole, adequately state the controlling law." *Id.*

We conclude that the instruction was properly given. Quinn and Blanton argued that they were merely carrying out their ordinary responsibilities at EOAF and that the automation project was necessary with or without CTI or West. The district court properly gave an instruction responsive to this argument, and the instruction accurately stated controlling law. It is not necessary for conviction under § 201(b) that the official act offered in exchange for the bribe be harmful to the government or inconsistent with the official's legal obligations. *United States v. Miller*, 340 F.2d 421, 424 (4th Cir. 1965). The critical question is whether the government official solicited something of value with a corrupt intent, *i.e.*, in exchange for an official act. *Jennings*, 160 F.3d at 1014. By the same reasoning, it does not matter whether the government official would have to change his or her conduct to satisfy the payor's expectations.[6]

---

[6]The defendants' reliance upon *Woelfel v. United States*, 237 F.2d 484 (4th Cir. 1956), is unavailing. We reversed the conviction in that case — a gratuity case — because the defendant was entitled to an instruction that there could be no conviction if he made the solicitation *after* he had "exhausted his power of decision or action on the matter before him" and was not expecting that any gratuity would be forthcoming. *Id.* at 488. Indeed, it cannot be said that an official solicits a bribe in exchange for an official act if the official act at issue has already been completed when the solicitation is made. The evidence in this case leaves no doubt, however, that Quinn and Blanton made the solicitations to CTI and West while they still had power to recommend favorable treatment for CTI and West on EOAF automation contracts. Blanton's adverse responses to CTI's and West's refusals to cooperate demonstrate that her "power of decision or action" had not been exhausted.

Finally, Quinn and Blanton requested an instruction defining reasonable doubt. The district court properly refused to give such an instruction. *See United States v. Reives*, 15 F.3d 42, 45 (4th Cir. 1994) (noting that we have "consistently and vigorously condemned the attempts of trial courts to define reasonable doubt" unless requested to do so by the jury).

C.

Quinn and Blanton next argue that the evidence adduced by the government was not sufficient to prove a violation of § 201(b). When considering a sufficiency-of-the-evidence challenge to a guilty verdict, we must sustain the jury's verdict if it is supported by substantial evidence. *United States v. Glasser*, 315 U.S. 60, 80 (1942). In determining whether the evidence in the record is "substantial," we view the evidence in the light most favorable to the government and ask whether there is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862-63 (4th Cir. 1996).

The evidence in this case firmly supports the convictions of Quinn and Blanton on both Count Four and Count Seven. The evidence showed that Quinn and Blanton, while employed with the EOAF, (1) sought to engage CTI to perform the automation project at EOAF on the condition that CTI would hire Quinn and pay him a salary of $125,000 plus other compensation and (2) sought to engage West to perform a similar project on the condition that West engage Beisler as a subcontractor. When CTI and West refused to agree to these conditions, Blanton took adverse actions against both firms, lodging complaints against CTI's performance on another contract and directing procurement officers to withdraw the offer to West. Thus, the evidence showed that Quinn and Blanton sought something of value — compensation for Quinn and Beisler — in exchange for favorable action on contracts for the EOAF automation project.

Quinn and Blanton argue that the evidence did not support a conviction on Count 4 — concerning CTI — because the automation contract offered to CTI was "nothing more than a vague objective." To the contrary, the evidence demonstrated that Quinn described a

detailed proposal for the work to be done and the compensation he would receive. His letters to CTI officials leave no doubt that Blanton's request that CTI hire Quinn as project manager for the automation project related to a specific future contract.

Quinn and Blanton contend that the evidence did not support a conviction on Count 7 — concerning West — because the contract was offered to West by Treasury Department procurement officers, not Quinn or Blanton. They also argue that there could be no solicitation of bribery where West had no intention to bribe them. It is certainly true that the offer to West was made by procurement officers and not Blanton directly. But it is also true that Blanton controlled the funds that would pay the contract price; she made the request for procurement; and she approved West as the contractor. The evidence further showed that once Blanton became displeased with West — because it refused to engage Beisler — she successfully had the offer withdrawn. The argument that there could be no conviction here because West did not intend to make a bribe is meritless. It is the defendants' intent that is relevant here, not West's. *See Jennings*, 160 F.3d at 1022. In sum, the evidence was sufficient to support the jury's convictions of Quinn and Blanton on both bribery counts.

D.

Quinn contends that the district court erred in permitting the government to elicit testimony concerning his refusal to answer certain questions during an internal Treasury Department investigation. According to Quinn, the government's use of testimony concerning his silence during and after an investigatory interview violated the rule that the government may not comment on a defendant's exercise of his Fifth Amendment rights. *See Doyle v. Ohio*, 426 U.S. 610, 618 (1976).

*Doyle* forbids the government to use a defendant's silence against him at trial where the government implicitly or explicitly advised the defendant upon arrest that he should keep silent. 426 U.S. at 619. Doyle was charged with selling marijuana to a police informant. *Id.* at 611. At trial, Doyle testified that he had been framed by the informant. *Id.* at 612-13. The government sought to impeach this testimony, suggesting that it was a recent fabrication, by asking Doyle

why he had not offered this explanation to the arresting officer. *Id.* at 614. The Supreme Court held that due process forbade the government to comment on Doyle's silence since that silence was induced by the government's giving Doyle *Miranda* warnings upon his arrest. *Id.* at 618. Because of the nature of *Miranda* warnings, "every post-arrest silence is insolubly ambiguous" and a jury is not permitted to draw any inference from such silence except that the defendant was exercising his Fifth Amendment rights. *Id.*

In evaluating *Doyle*-type claims, we focus on the question whether the government made any assurances to the defendant, either explicit or implicit, that his silence would not be used against him. *See Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993). Absent such assurances, there is no due process violation in using the defendant's silence to impeach his testimony at trial. Thus, the government may impeach a defendant by use of his silence prior to arrest, *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980), or even after his arrest if no *Miranda* warnings were given, *Fletcher v. Weir*, 455 U.S. 603, 606-07 (1982) (*per curiam*). "Such silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty." *Brecht*, 507 U.S. at 628.

Even where government officers warn a defendant about the consequences of his actions, there is no due process violation unless those warnings constitute assurances that the defendant's silence will not be used against him. *See South Dakota v. Neville*, 459 U.S. 553, 565 (1983). The defendant in *Neville* moved to suppress evidence showing that he refused to take a blood alcohol test after he was stopped for driving while intoxicated. *Id.* at 555-56. Rejecting Neville's *Doyle* claim, the Supreme Court noted that (1) the right to refuse the blood alcohol test, unlike the right to remain silent in a police interrogation, was a matter of legislative grace, not constitutional imperative; and (2) the warnings given to Neville by the police officers, unlike *Miranda* warnings, did not contain "implicit assurances as to the relative consequences of his choice" whether to take the test. *Id.* at 565. *Neville* thus reaffirms the central premise of *Doyle*, that due process is denied only when the government induces a defendant's post-arrest silence with the assurance that such silence will not be used against the defendant.

Special Agent Sandra Macadoff contacted Quinn and asked if he would be willing to sit for an interview concerning allegations she had received. Macadoff told Quinn that he was not obliged to grant the interview, that he could leave the interview at any time, that he was not in custody, and that no adverse administrative action would be taken against him should he refuse to grant the interview. Quinn agreed to the interview. Before the questioning began, Macadoff again advised Quinn that "this was strictly a voluntary situation and that he could leave at any time or stop the interview at any time." During the course of the interview, Quinn declined to answer certain questions concerning his interests in outside businesses.[7] At the close of the interview, Quinn agreed to provide Macadoff a copy of the notes he had taken during the interview.[8]

Agent Macadoff's comments to Quinn at the outset of the non-custodial interview cannot be construed as assurances to Quinn that his selective silence would not be used against him. These comments gave Quinn no information about the consequences of his choice to speak or keep silent; they merely informed him that he could choose not to be interviewed at all or to stop the interview at any time. More-over, Agent Macadoff's statement that no administrative action would be taken against Quinn if he declined the interview did not suggest that his silence would not be used against him in a later criminal pro-ceeding. Agent Macadoff's comments are thus readily distinguishable from *Miranda* warnings, which, by emphasizing the consequences of speaking, carry an implied assurance that a suspect's silence will not be used against him. *See Neville*, 459 U.S. at 565. Because the inter-view with Agent Macadoff occurred before Quinn was arrested and before he was given *Miranda* warnings, we conclude that *Doyle* does not apply and the district court properly allowed Agent Macadoff to testify about Quinn's responses to her questions.

---

[7]Agent Macadoff testified that Quinn asked questions of her during the interview, reading from a list of questions he had prepared previously. As Agent Macadoff answered Quinn's questions, Quinn made notes on his list.

[8]Although Quinn also asserts that the district court erred in denying his motion to suppress the notes, he makes no legal argument in support of this separate assertion. In any event, we find no violation of Quinn's Fifth Amendment rights in the government's use of notes that Quinn vol-untarily provided to Agent Macadoff during a non-custodial interview.

III.

The district court sentenced both Quinn and Blanton to 87 months' imprisonment. Under the relevant sentencing guideline, the base offense level for the bribery offenses was 10. U.S.S.G. § 2C1.1(a) (1997).[9] The district court then added two levels because the offense involved more than one bribe, *see id.* § 2C1.1(b)(1), and another fifteen levels to account for the "loss" attributable to the defendants' misconduct, *see id.* § 2C1.1(b)(2)(A). Having determined that Quinn and Blanton perjured themselves at trial, the district court applied a two-level enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. With an offense level of 29 and a criminal history category of I, Quinn and Blanton were eligible for prison terms ranging from 87 to 108 months.

Quinn and Blanton challenge their sentences on the grounds that (1) the district court applied a fifteen-level enhancement to the base offense level as the result of an incorrect "loss" calculation, (2) the district court improperly applied a two-level enhancement for obstruction of justice based upon the defendants' perjury at trial, and (3) the government improperly manipulated the application of the Sentencing Guidelines such that they were sentenced more harshly than was their co-defendant, Beisler.

A.

Quinn and Blanton contend that the district court erred in applying a fifteen-level enhancement to their base offense levels that resulted from the court's conclusion that the value of the benefit to be received in exchange for the bribes was $13.3 million, or the sum of the gross values of the contracts offered to CTI ($4.5 million) and West ($8.8 million). We review the district court's interpretation of the applicable sentencing guidelines *de novo* and its factual findings for clear error. *See United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir. 1989).

"For bribery offenses, the Sentencing Guidelines provide that the sentence shall be enhanced by the greatest of (1) the value of the brib-

---

[9]The parties agree that the 1997 version of the *United States Sentencing Guidelines* applies in this case.

ery payment, (2) the 'benefit received or to be received' as a result of the bribery payment, or (3) the loss to the government." *United States v. Kinter*, 235 F.3d 192, 194 (4th Cir. 2000) (quoting U.S.S.G. § 2C1.1(b)(2)(A) (1997)). The parties agree that the loss to the government is not the appropriate measure in this case.

The Application Notes offer the following examples relevant to calculation of the value of the benefit:

> (1) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received was $20,000.

U.S.S.G. § 2C1.1, comment. (n.2). These examples suggest that (1) the bribery payment is the "anything of value" sought by the government official, (2) the benefit to be received is the official action given in exchange for the bribe, and (3) the value of the benefit to be received is the net benefit to the payor, without regard for the value of the bribe. "Where the value of the bribe exceeds the value of the benefit or the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe." U.S.S.G. § 2C1.1, comment. (background).

The district court increased the base offense level by fifteen levels after finding that the value of the benefit to be received by CTI was $4.5 million and the benefit to be received by West was $8.8 million, for a total of $13.3 million. *See* U.S.S.G. § 2F1.1(b)(1). The government now concedes, as it must, that the district court erred in calculating the benefit to be received by CTI and West by adding the *gross*, rather than the *net*, values of the contracts. *See* U.S.S.G. § 2C1.1, comment. (n.2) (stating that the value of the benefit to be received is the net value of such benefit). The government contends that this error was harmless, however, because the record supports a finding that the net benefits to CTI and West exceeded $10 million, the threshold amount warranting a fifteen-level adjustment. The district court made no findings on any issue relevant to the net value of the benefits to

be received by CTI and West, and we decline to accept the government's new calculations absent such findings by the district court.

For this reason, we remand the case for resentencing. On remand, the district court should determine the greater of (1) the value of the bribery payment, *i.e.*, the "anything of value" solicited by the defendants from CTI and West or (2) the value of the net benefit to be received by CTI or West had they accepted the defendants' solicitations. If the greater of these values exceeds $2,000, then the court should consult the loss table included in U.S.S.G. § 2F1.1 and apply the appropriate adjustment to the base offense level. *See* U.S.S.G. § 2C1.1(b)(2)(A). The government bears the burden to prove facts supporting these values by a preponderance of the evidence, and the district court must "make a reasonable estimate of the loss, given the available information." *United States v. Miller*, 316 F.3d 495, 503 (4th Cir. 2003). The district court's estimation of loss "need not be determined with precision." *Id.*

We reject the defendants' argument that it is impossible to value the contracts proposed to CTI and West because they were never executed or even reduced to specific terms. For purposes of sentencing, there is no distinction between a solicitation of a bribe and a completed bribe. U.S.S.G. § 2C1.1, comment. (background) (stating that "[f]ailure to complete the offense does not lessen the defendant's culpability in attempting to use public position for personal gain"); *see also United States v. Tejada-Beltran*, 50 F.3d 105, 109 (1st Cir. 1995) (noting that "failure to consummate a bribe neither detracts from the donor's culpability nor renders the amount involved ineligible for use in setting the donor's offense level"). Similarly, the Guidelines focus on intended loss, not actual loss. *See* U.S.S.G. § 2F1.1, comment. (n.8). We have relied upon this rule in holding that a defendant may be sentenced according to the loss he or she intended, "even if this exceeds the amount of loss actually possible, or likely to occur, as a result of the defendant's conduct." *Miller*, 316 F.3d at 502. Thus, the district court should determine the value of the bribery payment and the value of the benefit to be received as if the contracts proposed to CTI and West had been executed.

For these same reasons, we also reject the defendants' argument that they cannot be held responsible for two proposed contracts that

concern the same subject matter since only one such contract would have been awarded. (The scope of work offered to West included the work proposed to CTI.) In addition, this argument is refuted by § 2C1.1(b), which identifies the value of the bribery payment and the benefit to be received as specific offense characteristics. Such characteristics are to be determined on the basis of "all acts and omissions committed" by the defendants. U.S.S.G. § 1B1.3(a)(1). Quinn and Blanton were convicted of two separate bribery crimes involving two separate contract proposals; there is no reason to ignore one of those crimes when calculating the loss for sentencing purposes.[10]

### B.

Quinn and Blanton next contend that the district court erred in applying a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. This enhancement applies to a defendant who commits perjury during the course of his or her prosecution. U.S.S.G. § 3C1.1, comment. (nn.1 & 4(b)). Application of this enhancement is appropriate if the sentencing court finds that "the defendant when testifying under oath (1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Jones*, 308 F.3d 425, 428 n.2 (4th Cir. 2002) (citing *United States v. Dunnigan*, 507 U.S. 87, 92-98 (1993)).

The district court made the following findings at sentencing:

> You had Mr. Beisler testify and you had others testify as to what happened, and then you had both defendants who took the stand and pretty much repudiated it. They vigorously denied what critical witnesses said about what happened at a house function and a dinner. And then we also heard from Ms. Blanton as to the reason that she withdrew the West contract, which was later determined to be — I don't know how else to say it other than a lie. I don't know how else to say it. The government in their rebuttal came back and

---

[10]Indeed, the defendants' offense levels were enhanced by two levels based upon the fact that there were multiple solicitations for bribes. *See* U.S.S.G. § 2C1.1(b)(1).

showed that her statement, her reasons given were false, and
the jury made that determination. She was caught in a lie.
. . . And Mr. Quinn made statements denying what had
taken place. But the point of the matter is that the jury just
didn't buy it. They didn't buy it. So I have to add two points
as to each for obstruction of justice.

Rather than argue that these findings were clearly erroneous, Quinn
and Blanton contend that their false testimony was not material. A
matter is material if it "would tend to influence or affect the issue
under determination." U.S.S.G. § 3C1.1, comment. (n.6). The district
court found that Quinn and Blanton lied when they denied facts
described by other witnesses concerning both the CTI and West pro-
posals. This false testimony concerned the essential facts charged in
both Count Four and Count Seven, and it was material to those
charges. *See United States v. Sun*, 278 F.3d 302, 314 (4th Cir. 2002)
(stating that the materiality of the defendant's perjury at trial was "ob-
vious" where it concerned "the heart of the case," his criminal intent).

Quinn and Blanton also argue that the enhancement was inappro-
priate because the resulting sentence was higher than they would have
received had they been convicted on a separate count of perjury. This
argument is meritless. Had Quinn and Blanton been convicted of brib-
ery *and* perjury, those counts would have been grouped together and
the offense level assigned to that group would have been the greater
of (1) the offense level for bribery, increased by two levels or (2) the
offense level for perjury. *See* U.S.S.G. § 3C1.1, comment. (n.8). The
base offense level for the bribery count was 10, and the adjustment
for obstruction would yield an offense level of 12. The base offense
level for perjury was 12. U.S.S.G. § 2J1.3(a). In this case, the base
offense level of 10 for bribery was adjusted by two levels to account
for the defendants' perjury, yielding an offense level of 12. Thus,
Quinn and Blanton were given the same treatment that they would
have received had they been convicted of a separate perjury offense.

C.

Finally, Quinn and Blanton challenge the district court's refusal to
depart from the Guidelines range to remedy the disparity between
their base offense levels and that of Beisler. Beisler pled guilty and

was sentenced to six months of home confinement. Quinn and Blanton went to trial and were sentenced to more than seven years in prison. The defendants moved the district court for a downward departure to correct the disparity caused by the government's alleged manipulation of the Guidelines. According to Quinn and Blanton, the government inappropriately relieved Beisler of any liability for the loss associated with the CTI and West contracts. While Quinn and Blanton were charged with a loss of more than $13 million — resulting in a fifteen-level enhancement to the base offense level — Beisler was charged with a loss of only about $124,000 — resulting in only a seven-level enhancement.

We have held that mere disparity among co-defendants' sentences is not a permissible ground for departure. *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996); *United States v. Ellis*, 975 F.2d 1061, 1066 (4th Cir. 1992). A departure is not warranted even where the disparity results from the use of different loss figures for co-defendants. *See United States v. Haehle*, 227 F.3d 857, 860 (7th Cir. 2000) (rejecting a defendant's challenge to a sentence based upon a $1.4 million loss when his co-defendant was sentenced based upon a $675,000 loss for the very same conduct). As the Seventh Circuit explained in *Haehle*, "co-defendants have no enforceable right to have sentences that are precisely congruent with one another. The only thing that matters is that the sentence complies with the guidelines . . . ." *Id.* We have held that a downward departure based upon disparity of sentences among co-defendants is not permitted "absent proof of prosecutorial misconduct." *Ellis*, 975 F.2d at 1066.

The district court recognized its authority to depart and entertained the defendants' argument on this point. The court ruled, however, that there was no evidence of prosecutorial misconduct in this case. Because the district court's refusal to depart downward followed its conclusion that the evidence did not support a departure, its ruling on that issue is not reviewable on appeal. *See United States v. Bayerle*, 898 F.2d 28, 30-31 (4th Cir. 1990).[11]

___

[11]We note that because Beisler was sentenced before Quinn and Blanton were sentenced, Quinn and Blanton were able to argue to the district court that the loss figure offered by the government was inconsistent

### IV.

We affirm the judgments of conviction for Quinn and Blanton. The indictment adequately alleged the facts underlying the bribery counts, and the jury instructions adequately stated the governing law. The evidence adduced at trial was sufficient to support the defendants' convictions on both bribery counts. We vacate the sentences, however, because they do not reflect an appropriate calculation of the loss attributable to the defendants' conduct. The case is remanded for resentencing in accordance with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

---

with, and much greater than, the figure offered for Beisler. Quinn and Blanton may raise this issue on remand, arguing that the smaller figure offered by the government in Beisler's sentencing is some evidence that the loss attributable to their conduct is less than the government contends. At the end of the day, it is for the district court in this case to calculate the loss attributable to Quinn and Blanton's conduct, not Beisler's.