**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 09-4704**

———————

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

     v.

RICHARD ADOLPHUS FORDE, a/k/a Euburn Richard A. Forde,

                Defendant - Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.   Anthony J. Trenga, District Judge.  (1:08-cr-00401-AJT-1)

———————

Argued:  October 27, 2010        Decided:  January 10, 2011

———————

Before TRAXLER, Chief Judge, DAVIS, Circuit Judge, and Damon J. KEITH, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Elita C. Amato, Arlington, Virginia, for Appellant. Thomas Higgins McQuillan, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Richard Adolphus Forde was convicted of bankruptcy fraud, see 18 U.S.C.A. § 157 (West Supp. 2010); conspiracy to commit bankruptcy fraud, see 18 U.S.C.A. § 371 (West 2000); and bank fraud, see 18 U.S.C.A. § 1344 (West 2000). Forde appeals, raising various challenges to his convictions. Finding no reversible error, we affirm.

I.

Viewed in the light most favorable to the government, the evidence presented at trial established the following. In the fall of 2001, Forde was facing substantial financial problems and was on the verge of losing his multi-million-dollar home through foreclosure. Forde and his wife filed a Chapter 11 bankruptcy petition, and Forde also began working with mortgage broker David Freelander to try to refinance his mortgage. When it became clear that refinancing would not be possible, Forde began seeking a buyer for his house.

Forde contacted Allodean Allobaidy, a real estate broker who had previously expressed interest in buying the house. When Allobaidy told Forde that he could not afford the house (which Forde said was worth more than $2 million), Forde responded, "Don't worry about it. I do have someone who could help you out with that." J.A. 525. Forde, Allobaidy, and Freelander

2

thereafter began discussions about Allobaidy buying the house. During the course of the negotiations, Allobaidy made it clear to Forde and Freelander that he would not qualify for a mortgage loan, that he would not make a down payment, that he would not make any mortgage payments, and that he should receive a commission for the sale of the house. The parties ultimately came up with a deal, and Allobaidy and Forde signed a contract for the sale of the property.

The contract, which was drafted by Leslie Lickstein, Forde's bankruptcy attorney, listed the sales price as $5,495,000, and required from Allobaidy a down payment of $450,000; a conventional loan in the amount of $3,846,500, to be secured by a first mortgage; and a promissory note payable to Forde in the amount of $1,099,000, to be secured by a second mortgage. An addendum to the contract established what can only be described as a "slush fund," providing that approximately $700,000 of funds that Forde would receive at closing would be placed in a separate account as a "move-in and fix-up allowance" for Allobaidy. J.A. 1326. Allobaidy testified, however, that the real purpose of the slush fund was to provide funds with which the first-mortgage payments would be made. Allobaidy also testified that, despite the terms of the contract, everyone involved in the transaction knew and agreed that he would not be

3

making any down payment, mortgage payments, or payments on the promissory note.

Lickstein submitted the sales contract to the bankruptcy court and obtained approval for the sale of Forde's house. Lickstein testified that the down-payment and the seller-held promissory note were very important terms of the contract from the bankruptcy perspective because the down-payment and the payments to be made under the note would be available to Forde's creditors.

Freelander worked to obtain the first mortgage through Lehman Brothers Bank. Allobaidy testified that he and Freelander, with Forde's knowledge, provided Lehman with false documents and false information to make Allobaidy appear qualified for the loan. Among the documents that Freelander submitted to Lehman was the sales contract. Before submitting the contract to Lehman, however, Freelander removed the addendum that established the slush fund, telling Forde and Allobaidy that Lehman probably would not approve the loan if it knew about the slush fund.

Lehman approved the loan to Allobaidy, and the sale closed on June 28, 2002, in Lickstein's office. The terms of the contract had changed by the time of closing, calling for a sales price of $5,995,000; a down payment of $550,000; a first mortgage in the amount of $3,896,750; and a promissory note from

4

Allobaidy in the amount of $1,498,750. The slush fund provided for in the addendum was reduced from the original $700,000 to just over $477,000.

The HUD-1 closing statement, which was signed by Forde, Forde's wife, and Allobaidy, showed a down payment of $550,000, even though no down payment was in fact made. The HUD-1 statement also showed that a portion of the mortgage proceeds ($539,000) was used to satisfy a lien filed against the property by Isaac Archibald in connection with a loan Archibald made to Forde. The government's evidence, however, established that there had never been a loan from Archibald to Forde and that the Archibald lien had actually been filed against the property by Lickstein at Forde's direction. After closing, Lickstein wired the $539,000 into an account controlled by Freelander, who in turn paid out some of the funds in accordance with Forde's directions and used some of the funds for his own benefit. The money for the slush fund was initially maintained in Lickstein's escrow account. At Forde's direction, Lickstein later transferred the funds to a brokerage account in Forde's name.

Forde and his wife remained in the house after the sale. Allobaidy never took possession of the house, and Forde never paid him rent. Payments on the Lehman first mortgage were made from the slush fund for a period of time, but the slush fund eventually ran out and the mortgage went into default.

5

In November 2002, the bankruptcy court converted Forde's Chapter 11 proceeding to a Chapter 7 proceeding. The Chapter 7 trustee began looking into the sale of Forde's house and ultimately filed a civil action against Forde to recover for the benefit of Forde's creditors the monies Forde received from the sale of the house. Counsel for the trustee sought to depose Forde, Freelander, and Allobaidy (among others), and the three men met to discuss how the depositions should be handled. Freelander asked Allobaidy to lie and say that he had made the down payment. Allobaidy in fact did testify at his deposition that he had made the down payment.

Forde later brought Barton Gold, who had solicited investors for Forde's online business Tutornet.com, into the scheme, convincing Gold to sign back-dated, false documents showing that the $539,000 Archibald loan had actually been made by Gold and only guaranteed by Archibald. At the deposition conducted on behalf of the bankruptcy trustee, Forde offered up the Gold/Archibald story and documents to explain the $539,000 distribution made at closing. Gold later gave similar false testimony in his own deposition.

The bankruptcy trustee's investigation into the sale of Forde's house ultimately led to the filing of criminal charges against Forde, Freelander, Lickstein, and Allobaidy. Freelander pleaded guilty to charges of bank fraud and bankruptcy fraud;

6

Lickstein and Allobaidy pleaded guilty to conspiracy to commit bank fraud. Forde proceeded to trial, and Freelander, Lickstein, and Allobaidy all testified against him. The jury convicted Forde of bank fraud, bankruptcy fraud, and conspiracy to commit bankruptcy fraud. The district court sentenced Forde to 42 months' imprisonment. This appeal followed.

## II.

Forde first contends that the evidence was insufficient to support the conviction for bank fraud. "A defendant challenging the sufficiency of the evidence faces a heavy burden, because the jury's verdict must be upheld on appeal if there is substantial evidence in the record to support it." United States v. Young, 609 F.3d 348, 355 (4th Cir. 2010) (citation and internal quotation marks omitted). "Our review is thus limited to determining whether, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government, the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." Id. (internal quotation marks and alteration omitted).

Section 1344 imposes criminal penalties on anyone who "knowingly executes, or attempts to execute, a scheme or artifice" in order to "defraud a financial institution," 18 U.S.C.A. § 1344(1), or to "obtain any of the moneys, funds,

7

credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises," id. § 1344(2). As to § 1344(1), Forde contends that it was Freelander who concocted and executed the scheme to defraud Lehman. According to Forde, "[i]t was Freelander who dealt with the bank, knew what they required and made decisions of how to conform with the bank's requirements." Brief of Appellant at 15. With regard to § 1344(2), Forde contends that he, personally, did not make any false statements to Lehman, because it was Freelander, not Forde, who provided the false information and documents to Lehman. While Forde acknowledges that Freelander told him about the problems that the slush fund addendum could cause if the bank knew about it, Forde insists that it was Freelander, "not Mr. Forde[,] who either made the decisions that something should be handled a certain way or that documents should not be provided to the bank or information not revealed." Id. We find these arguments unpersuasive.

Preliminarily, we note that while Forde may not have personally submitted any documents to Lehman, he certainly made false representations in documents that he knew would be provided to Lehman -- Forde signed the sales contract, which called for a down payment by Allobaidy and payments by Allobaidy under a promissory note that the parties to the contract knew

8

would never be made; and Forde signed the HUD-1 statement, which, among other things, showed the down payment as having been made. Even assuming that this conduct somehow does not amount to the making of false representations within the meaning of § 1344(2), the government's evidence was more than enough to support Forde's conviction under § 1344(1).

"The government need not offer evidence of misrepresentations or a disclosure duty to prove a violation of § 1344." United States v. Colton, 231 F.3d 890, 907 (4th Cir. 2000); see United States v. Celesia, 945 F.2d 756, 758 (4th Cir. 1991) ("[O]ne may commit a bank fraud under Section 1344(1) by defrauding a financial institution, without making the false or fraudulent promises required by Section 1344(2)."). "What is essential is proof of a 'scheme or artifice to defraud,' which can be shown by deceptive acts or contrivances intended to hide information, mislead, avoid suspicion, or avert further inquiry into a material matter." Colton, 231 F.3d at 901.

The government's evidence was certainly sufficient to establish the existence of a scheme to defraud Lehman -- the parties induced Lehman to make the loan by lying about a down payment and by concealing the existence of the slush fund, facts that a Lehman employee testified were material to Lehman's decision to make the loan. See id. at 901 ("[A]ctive or elaborate steps to conceal information can constitute" a scheme

9

to defraud. (internal quotation marks omitted)). The government's evidence was likewise sufficient to establish that Forde was at least as involved as Freelander in hatching and executing that scheme to defraud. Although Forde insists that Freelander came up with the scheme to defraud Lehman, Allobaidy's testimony alone would have been enough for the jury to conclude that Forde was responsible for the scheme. Moreover, the government's evidence established that Forde and Freelander controlled the mortgage proceeds that were used to "satisfy" the fictitious Archibald lien. At Forde's direction, the Archibald proceeds were wired to a bank account controlled by Freelander, a portion of which were later wired to a bank account belonging to Forde's then brother-in-law, to keep the money out of Forde's bankruptcy estate and thus out of the reach of his creditors. The slush fund proceeds were similarly transferred to a brokerage account belonging to Forde. Because the evidence showed that Forde and Freelander both controlled and received the benefit of these misappropriated mortgage funds, the jury reasonably could have concluded that Forde and Freelander both conceived and executed the scheme to defraud Lehman. We therefore conclude that the evidence was more than sufficient to support Forde's conviction for bank fraud.[1]

---

[1] Given our disposition of this claim, it is unnecessary for
(Continued)

10

III.

Materiality is an element of bank fraud. See Neder v. United States, 527 U.S. 1, 25 (1999); Colton, 231 F.3d at 903 n.5. The district court instructed the jury that the government was required to prove the materiality of the representations made to Lehman or the information concealed from Lehman, defining "material fact" as "a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction." J.A. 1225-26. Forde argues on appeal, however, that the district court's definition of materiality was insufficient because it did not include language from the Supreme Court's decision in Neder generally defining a material statement as one that "has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." Neder, 527 U.S. at 16 (internal quotation marks and alteration omitted). Forde further argues that the instruction as given "in essence took away the element of materiality," and that he was therefore deprived of his Sixth Amendment right to a jury determination of

us to consider the government's alternate argument that Forde's bank fraud conviction can be sustained because Forde caused Freelander to commit bank fraud. See 18 U.S.C.A. § 2(b) (West 2000) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.").

11

each element of the bank fraud charge.  Brief of Appellant at 25.  Because Forde did not object to the jury instruction below, we review his claims for plain error only.

We see no significant difference between the instruction sought by Forde and the instruction given, because a fact that would be important when making a decision would likewise be capable of influencing a decision.  See Preston v. United States, 312 F.3d 959, 961 & n.3 (8th Cir. 2002) (per curiam) (concluding that instructions defining "material fact" as "a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction" were "consistent with those reaffirmed by the Supreme Court in Neder" (internal quotation marks omitted)).  Because the instructions as given "fairly state[d] the controlling law," United States v. McQueen, 445 F.3d 757, 759 (4th Cir. 2006) (internal quotation marks and alterations omitted), there was no error, plain or otherwise, in the court's instructions on materiality.  See United States v. Heppner, 519 F.3d 744, 749 (8th Cir. 2008) (finding no error in jury instruction defining "material fact" as "a fact which would be of importance to a reasonable person making a decision about a particular matter or transaction" (internal quotation marks omitted)).

IV.

Forde next argues that the district court erred when it stated, at the end of the instructions to the jury, that the jury's sole function "is to seek the truth from the evidence received during the trial." J.A. 1233. According to Forde, the seek-the-truth statement negated the otherwise proper reasonable-doubt instructions by permitting jurors to convict simply because they believed him to be guilty, even if the jurors also thought that the government had not actually proved Forde's guilt beyond a reasonable doubt.

Because the seek-the-truth language was included in the jury charges that Forde himself sought, see J.A. 72, Forde arguably has waived the right to even seek review of the issue. See United States v. Quinn, 359 F.3d 666, 674-75 (4th Cir. 2004) ("[T]he record shows . . . that the district court's instruction on this issue was precisely the instruction that they requested. . . . [A]ny error committed by the district court in giving this instruction was invited error and is not subject to review."). In any event, the district court repeatedly informed the jury that Forde was presumed innocent, and the court mentioned the requirement that the government must prove Forde's guilt beyond a reasonable doubt more than twenty times during its instructions. Under these circumstances, we cannot conclude that the single seek-the-truth reference, which the court made

13

in the course of admonishing individual jurors not to surrender their honest convictions, negated or undermined the otherwise proper reasonable-doubt instructions or otherwise amounted to error. See United States v. Gonzalez-Balderas, 11 F.3d 1218, 1223 (5th Cir. 1994) ("There is no reasonable likelihood that the jury inferred that the single reference at the end of the charge to 'seeking the truth,' rendered as it was in the context of an admonition to 'not give up your honest beliefs,' modified the reasonable doubt burden of proof.").

V.

As previously mentioned, the Chapter 7 bankruptcy trustee investigated the sale of Forde's house and brought a civil action against Forde to recover funds associated with the sale of the house. That action ended with Forde signing a consent judgment obligating him to pay $800,000. The attorney who represented the bankruptcy trustee testified at Forde's criminal trial and briefly mentioned the $800,000 consent judgment in his testimony.

On appeal, Forde claims the testimony about the consent decree violated Rule 408 of the Federal Rules of Evidence. See Fed. R. Evid. 408(a) (prohibiting evidence of compromise or offers to compromise "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to

14

validity or amount, or to impeach through a prior inconsistent statement or contradiction"). Forde also claims that even if testimony about the consent judgment was proper under Rule 408, the testimony was too prejudicial and therefore should have been excluded under Rule 403. See Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

We disagree. Assuming, without deciding, that the admission of the testimony amounted to error under Rule 403 or Rule 408, any such error would be harmless. The government's evidence of bankruptcy fraud was exceptionally strong, and the testimony about the consent judgment was minimal. Moreover, counsel for Forde during cross-examination established that the bankruptcy proceedings were civil and governed by a lesser burden of proof. Under these circumstances, we think it clear that the jury's verdict was not "substantially swayed" by any error in admitting the evidence of the consent judgment. United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995) ("[I]n order to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the

judgment was not substantially swayed by the error." (internal quotation marks omitted)).

VI.

Finally, Forde contends that the district court erred by rejecting his post-verdict claims of juror misconduct. In a post-trial motion, Forde informed the district court that while the trial was proceeding, a friend of the husband of the jury foreperson posted on Twitter an explanation of the difference between "assume" and "presume."[2] Ford contended that, since the posting occurred during trial, it was possible that the jury foreperson had talked to her husband about the case, her husband then talked to his friend about the case, the friend then posted the statement on Twitter, and the foreperson saw the Twitter posting. Forde thus requested that the district court hold a hearing to investigate the potential misconduct. The district court denied the request.

On appeal, Forde contends that the district court erred by denying the requested hearing. We disagree. A district court is obligated to investigate colorable claims of juror misconduct. See, e.g., Smith v. Phillips, 455 U.S. 209, 215

---

[2] The posting stated, "assume: suppose to be the case, without proof; presume: suppose that something is the case on the basis of probability." J.A. 1423.

16

(1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."); id. at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a [post-trial] hearing . . . ."). However, "[t]he duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality. In other words, there must be something more than mere speculation." United States v. Barshov, 733 F.2d 842, 851 (11th Cir. 1984) (citation omitted); accord United States v. Vitale, 459 F.3d 190, 197 (2d Cir. 2006) ("[A] trial court is required to hold a post-trial jury hearing when reasonable grounds for investigation exist. Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." (citation and internal quotation marks omitted)). Forde's string of possibilities about the origin of the Twitter posting -- that the foreperson possibly talked to her husband, who possibly talked to his friend, who possibly took to Twitter in

17

response to what the husband possibly told him -- is nothing but speculation and thus falls far short of establishing reasonable grounds for investigation. The district court therefore did not err by denying Forde's request for an evidentiary hearing to investigate his claim.

Forde also contends that the district court erred by denying his post-verdict request for the issuance of subpoenas directed to various internet service providers. Forde claims that his business websites were viewed during the trial, and that the subpoenas were necessary "to assess whether any of the twelve jurors were the ones who had accessed the sites and searched his name." Brief of Appellant at 40. This argument is utterly without merit, as it is even more speculative and less grounded in fact than his other claim of juror misconduct. The district court committed no error by refusing to issue the subpoenas necessary for Forde's fishing expedition.


VII.

Because we find no reversible error, we hereby affirm Forde's convictions and sentence.

AFFIRMED

18