**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4590**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RAUSHI J. CONRAD,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Gerald Bruce Lee, District Judge.  (1:16-cr-00169-GLB-1)

Argued:  December 13, 2018                          Decided:  January 24, 2019

Before KEENAN, FLOYD, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Alan Hideto Yamamoto, Alexandria, Virginia, for Appellant.  Matthew B. Burke, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Tracy Doherty-McCormick, Acting United States Attorney, Jamar K. Walker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Raushi J. Conrad ("Appellant") appeals from his jury trial convictions for acceptance of bribes by a public official and conspiracy to commit bribery, and the district court's imposition of a 48 month sentence. He presents three arguments on appeal: the Government's delay in prosecuting him prejudiced his defense; the evidence at trial was insufficient to support his convictions; and the district court erred in applying a sentencing enhancement for public officials in high-level decision-making positions. For the following reasons, we reject each of these arguments and affirm.

## I.

## A.

## Indictment

On July 28, 2016, a grand jury sitting in the Eastern District of Virginia returned an indictment charging Appellant with one count of acceptance of bribes by a public official, in violation of 18 U.S.C. § 201(b)(2)(A), and one count of conspiracy to pay and receive bribes, in violation of 18 U.S.C. § 371. The indictment alleged that Appellant, while employed at the United States Department of Commerce, accepted hundreds of thousands of dollars in payments and renovation work at his home from James Bedford, in return for taking official acts to steer government contracts to companies owned by Bedford.

On March 21, 2017, Appellant filed a motion to dismiss the indictment, arguing that his "Fifth Amendment right to a fair trial was substantially prejudiced and violated

by [a 57 month] pre-indictment delay." J.A. 44.[1] He claimed that the Government "desire[d] to gain tactical advantage," and the delay "affected the availability of witnesses and records which may have been available to him if a timely indictment would have been returned." *Id.* The district court denied the motion on April 14, 2017, explaining that Appellant failed to show he suffered actual prejudice and, even if the delay prejudiced him, the reasons for delay (i.e., Appellant's own concealment of evidence and the significant time required to interview witnesses, collect records, and discover other evidence) outweighed the purported prejudice.

B.

Evidence at Trial

The case proceeded to a jury trial, which commenced on June 12, 2017. The evidence at trial, viewed in the light most favorable to the Government, *United States v. Cowden*, 882 F.3d 464, 474 (4th Cir. 2018), revealed the following.

1.

Background

In or around 2003, Appellant began working in the Bureau of Industry and Security ("BIS"), a branch of the United States Department of Commerce. Within the BIS, Appellant served in the Office of the Chief Information Officer ("OCIO") as Director of Operations and Systems Security. In 2006, the BIS computer systems were

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

infected by a virus, which required the entire network to be disconnected from the Internet. BIS then had to construct an entirely new network and perform data migration -- obtaining necessary files from the old network, ensuring they had no viruses, and then transferring them to the new network. Appellant was designated as project manager to oversee the data migration process. In this capacity, Appellant had "[t]otal control" over the project and was "responsible for all aspects of the data migration" and "establishment of the new network." J.A. 396, 394. Appellant devised the process for ensuring that migrated files would not contaminate the new network, identified the users within BIS who needed to have files migrated, served as the sole point of contact for BIS employees who had questions about the process, and was the only BIS employee with day-to-day involvement in the project.

2.

Data Migration Contract Award

BIS used a branch of the Navy known as the Space and Naval Warfare Systems Command ("SPAWAR") to handle the hiring of contractors for technical support and services. In a typical case, Appellant's subordinate at BIS, Robert Moffett, would work with SPAWAR representative Kim Bryant to draft a written statement of work describing what needed to be done for a project. If SPAWAR's in-house engineers could not perform the work, Bryant would conduct a search for private companies who could. Typically, once a contractor was hired, Moffett would serve as the main point of contact with that company, and he would take the lead in monitoring that company's work.

4

In this case, however, Appellant deviated from the normal process and facilitated the hiring of Bedford's Images, Inc. ("Bedford's Images"), a company owned by Bedford, to complete the data migration project. Specifically, Government witnesses testified that in May or June 2010, Appellant, rather than Moffett, wrote the statement of work defining what work would be done. Appellant also advised Moffett that Bedford's Images could perform the type of services described in that statement of work, recommending no other companies when doing so. Then, on June 4, 2010, Moffett sent an email -- drafted by Appellant -- to Bedford containing the statement of work for the project. Appellant also contacted Bryant at SPAWAR directly, and (as Bryant testified) "was very emphatic that Bedford's Images could perform this effort and that's who he wanted to do the work." J.A. 455. Prior to Appellant cheerleading for Bedford's Images, neither Moffett nor Bryant had heard of Bedford's Images, which had never performed any kind of computer-related work for BIS.

Following Appellant's recommendation that Bedford's Images be hired, Bryant contacted Henry Hodor, president of Tridea Works, LLC ("Tridea"), a company which held an existing prime contract with the government. Hodor testified that Bryant called him and "identified Bedford['s] Images as the company to use" as the subcontractor to perform the data migration work. J.A. 494. Prior to this phone call, Hodor knew nothing about the data migration work, nothing about Bedford's Images or its capabilities, and was never asked to obtain competitive bids from other companies.

Ultimately, on June 14, 2010, Bedford's Images was formally awarded the data migration subcontract. At this time, Tridea had not obtained a statement of work;

5

however, ten days earlier, Bedford had received the written statement of work directly from BIS (in the aforementioned email sent by Moffett but drafted by Appellant). Indeed, Tridea had to obtain a copy of the statement of work directly from Bedford. Hodor understood Tridea's role to be merely "receiving invoices from [Bedford's Images] and passing them on to SPAWAR for payment" with no "substantive involvement." J.A. 498–99.

3.

Appellant's Request for Loan

In the late spring or early summer of 2010 -- before Bedford's Images was awarded the data migration contract -- Appellant appeared unannounced at the office of Team America Contractors ("Team America"), a company owned jointly by Bedford and another man named Glenn Bertrand.[2]

When Appellant arrived at Team America's office, Appellant, Bedford, and Bertrand met privately. Appellant asked Bedford and Bertrand for a $180,000 loan. Bedford responded that they did not have "that type of money to loan." J.A. 534. Appellant responded that it could be an "investment loan/investment for Chicken Place."[3] There was no further discussion about the specifics for a loan, such as a repayment

---

[2] In the past, Team America had performed construction work for the Commerce Department.

[3] "Chicken Place," otherwise referred to as "Chicken Place Express" or "CPE," is a restaurant Appellant owned, in addition to his job at the Commerce Department, during the time in question.

6

schedule or interest rate. Of note, a few weeks after this meeting, Bedford's Images received a request for a proposal to bid on the data migration subcontract, which it was awarded.

4.

Project Results and Extension of Contract

After Bedford's Images was awarded the subcontract, Appellant continued to exercise control over the day-to-day operation of the project. Under his supervision, BIS employees were directed to send any questions about the process to Appellant. Appellant personally delivered the files that needed migrating to Bedford's Images and retrieved them after they had been converted.

Pursuant to the contract, from August 2010 to June 2011, Bedford's Images was paid a total of $1,138,724.14. The only equipment expense Bedford incurred was the purchase of standard PDF conversion software bought at an Office Depot for $209.97. Bedford's Images had no employees when it won the subcontract; Bedford brought in family members, friends, and neighbors to do the work, many of whom lacked any formal computer training or expertise. Bedford incurred total costs of $59,563.12 to do the work (the price of the software plus payments to "employees"). Accordingly, Bedford made $1,079,161.02 in profits from the contract.

Before long, however, Appellant, the sole contact person for BIS employees for the data migration project, received extensive complaints about corrupted data, unworkable formatting, missing documents, lack of functionality of files, missing

7

templates, and illegible and unusable character recognition. Despite these complaints, Appellant never sought to halt Bedford's Images' involvement in the project.

Notwithstanding the complaints about Bedford's Images' work, on September 7, 2011, Appellant sought and obtained approval from BIS officials to authorize an additional payment of $54,984.63 to Bedford's Images to perform further data migration work. Appellant did not obtain competitive quotes or bids from any other company.

5.

Fake Invoices and Payments to Appellant

During this time, Appellant continually sent invoices to Team America. To facilitate payment, in December 2010, Appellant personally delivered to Team America's office an invoice that he created. The invoice, which the parties agree was fake, purported to be from "CPE" (an abbreviation for Appellant's business, Chicken Place Express) and requested payment of $55,000 from Team America for "Support Services." J.A. 1209. Neither Appellant nor CPE had ever performed any services for Team America.

Bedford knew the invoice was fake and, according to Bedford, both he and Bertrand recognized it as a veiled request for a bribe from Appellant. *See* J.A. 843 ("While [Appellant] never said, 'This payment is in exchange for my directing work to Team America and Bedford's Images[,]' both Bertrand and I knew it was. It was basically a classic wink and nod."). Nonetheless, Bedford paid the $55,000 invoice on December 15, 2010, because he wanted to keep the data migration work coming to Bedford's Images. Appellant personally picked up the check.

In the months that followed, Bedford and Bertrand continued to receive fake invoices from Appellant for work neither he nor CPE performed, which Bedford paid, intending to bribe Appellant in exchange for receiving and maintaining the data migration work. In total, from November 2010 through August 2011, Bedford issued eight checks made payable to "CPE" in the total amount of $208,000.

In addition to the payments, from May 2011 through August 2011, Bedford and Bertrand further provided $7,821.75 worth of free labor and supplies to renovate the basement of Appellant's personal residence. This led to a grand total of $215,821.75 in payments and other items of value that Appellant received from Bedford.

On October 19, 2011, investigators from the Commerce Department's Office of Inspector General interviewed Appellant and asked him about his "outside relationship" with Team America. J.A. 2831. Appellant replied, "I don't really have one with Team America other than, hey, they do work and I send them files that they do for us and I say okay here's the files and do whatever for Team America. So I don't really have one specifically with Team America . . . ." *Id.* Appellant did not disclose the payments or free labor and supplies he had received from Team America.

At the close of evidence, Appellant moved for judgment of acquittal on both counts pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motion.

9

C.

Verdict and Sentencing

Following a three and a half day trial and two and a half hour deliberation, the jury convicted Appellant of conspiracy to commit bribery and acceptance of bribes by a public official on June 15, 2017.

Appellant was sentenced on September 8, 2017. At sentencing, the Government sought a four-level enhancement under U.S.S.G. § 2C1.1(b)(3), asserting that the offense involved a "public official in a high-level decision-making or sensitive position." The district court found that the enhancement applied, noting that "SPAWAR had no reason to know who Bedford's Images was or to give them a contract except for [Appellant's] referral of them and his suggestion, as the project manager, that this was the entity he wanted to work with to do the work." J.A. 1173–74. Appellant was sentenced to 48 months of imprisonment on each count, to run concurrently, which was well below the Guidelines range of 121 to 151 months.

II.

In this appeal, Appellant contends the Government's delay in prosecuting him prejudiced his defense; the evidence at trial was insufficient to support his convictions; and the district court erred in applying a sentencing enhancement for public officials in high-level decision-making positions. We address each contention in turn.

A.

Pre-Indictment Delay

We begin with Appellant's argument that the Government's "unwarranted delay in prosecuting [him]" prejudiced his defense. Appellant's Br. 37. The Government contends that Appellant abandoned this argument because he did not fully and appropriately present it in his opening brief. We agree with the Government.

Federal Rule of Appellate Procedure 28 provides, "The appellant's brief must contain . . . the argument, which must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. Proc. 28(a)(8)(A). We have held, "Failure to comply with the specific dictates of this rule with respect to a particular claim triggers abandonment of that claim on appeal." *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999).

The argument section of Appellant's opening brief correctly states that for a claim of unwarranted delay, our initial inquiry is whether Appellant has shown actual prejudice from a purported delay, and "the burden of proving such prejudice is clearly on [Appellant]." *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 403 (4th Cir. 1985); *see also United States v. Marion*, 404 U.S. 307, 324 (1971). On the contention that he suffered prejudice, Appellant provides the following reasoning:

> [T]he delay resulted in the loss of records essential to the appellant's defense, resulted in the failure of witnesses to recall events essential to the appellant's defense and, in particular, the events during a meeting concerning the data migration project, and the loss of other evidence essential to

11

> proving that the appellant was not part of a bribery conspiracy and did not receive a bribe.

Appellant's Br. 38. But Appellant does not make a single "citation[] to . . . authorities" supporting the argument that these alleged circumstances constitute prejudice, and there are no citations to "parts of the record" demonstrating which records were lost, which witnesses cannot recall certain events, what those events were, and whether and how such evidence would be essential to proving Appellant was not part of the conspiracy. Fed. R. App. Proc. 28(a)(8)(A). Therefore, Appellant has abandoned the argument that he was prejudiced by the Government's delay, and we decline to address it.[4]

B.

Sufficiency of the Evidence

Appellant next argues that the evidence presented at trial was insufficient to support his convictions.

To convict Appellant of bribery pursuant to 18 U.S.C. § 201(b)(2)(A), the Government was required to prove: (1) at the time of the offense, Appellant was a "public official or person selected to be a public official"; (2) Appellant directly or indirectly demanded, sought, received, accepted, or agreed to receive or accept "anything of value"; and (3) he did so corruptly "*in return for* . . . being influenced in the performance of any *official act*." 18 U.S.C. § 201(b)(2)(A) (emphases supplied). To convict Appellant for

---

[4] Even if this claim were not abandoned, we find Appellant's argument to be without merit for the same reasons -- he failed to carry his burden with specific examples of prejudice, both in the district court and on appeal.

12

conspiracy to commit bribery pursuant to 18 U.S.C. § 371, the Government was required to prove: (1) "an agreement between two or more people to commit a crime"; and (2) "an overt act in furtherance of the conspiracy." *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997). "The existence of a 'tacit or mutual understanding' between conspirators is sufficient evidence of a conspiratorial agreement." *Id.* (quoting *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990)).

First, Appellant asserts that the Government did not establish there was a quid pro quo -- that is, that Appellant's conduct was done "in return for" the things of value he received. Second, Appellant argues that the Government failed to demonstrate that he committed an "official act" pursuant to § 201(b)(2)(A).[5]

We review a challenge to the sufficiency of the evidence to support a defendant's conviction de novo. *See United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018). A jury's verdict "must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015) (internal quotation marks omitted). "Substantial evidence is that which a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* at 269–70 (internal quotation marks omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

---

[5] The parties stipulated that Appellant was a public official as defined in 18 U.S.C. § 201(a)(1).

essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

## 1.

## Quid Pro Quo

### a.

We have held, "For bribery there must be a quid pro quo -- a specific intent to give or receive something of value in exchange for an official act." *United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004) (emphasis omitted) (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999)). But this agreement "need not be explicit, and the public official need not specify the means he will use to perform his end of the bargain." *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016); *see also Quinn*, 359 F.3d at 673 ("[T]he government is not required in a bribery case to prove 'an expressed intention (or agreement) to engage in a quid pro quo.'" (quoting *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998))).

"Nor must the government prove 'that the defendant intended for [the] payments to be tied to specific official acts (or omissions).'" *Quinn*, 359 F.3d at 673 (quoting *Jennings*, 160 F.3d at 1014). Instead, "it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action." *Id.* (quoting *Jennings*, 160 F.3d at 1014). Thus, "the quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor." *Id.* (alteration and emphasis omitted) (quoting *Jennings*, 160 F.3d at 1014).

The evidence in this case supports Appellant's convictions on both counts. Most notably, Appellant (1) showed up unannounced at Team America's office to ask Bedford and Bertrand for a $180,000 "loan"; (2) dictated the statement of work himself, even though this would usually be done by Moffett, and ensured Bedford received a copy of it even before the prime contractor Tridea; (3) recommended to both Moffett and Bryant that Bedford's Images should do the work; (4) sought no competitive quotes from companies other than Bedford's Images; (5) exercised near total control over the day-to-day operation of the project; (6) served as the contact person about the project for all BIS employees; (7) received numerous complaints about the quality of Bedford's Images' work, but he never sought to end Bedford's involvement in the project; and (8) sought and obtained approval from BIS officials to authorize additional payment for Bedford's Images. Moreover, over the course of these events, Appellant sent fake invoices to Bedford and Bertrand and received well over $200,000 in checks and other items of value from Team America.

b.

To the extent Appellant makes the argument that there was no quid pro quo because Appellant did not have final authority to award the contract to Bedford's Images, it is meritless. Establishing a quid pro quo does not require that the official be the sole decision maker in a matter, or even that the public official actually perform an official act; it is enough that the official agree to do so. *See McDonnell*, 136 S. Ct. at 2370–71. Quid pro quo requires only that Appellant have "specific intent to give or receive

15

something of value in exchange for an official act." *Quinn*, 359 F.3d at 673 (emphasis omitted) (quoting *Sun–Diamond Growers*, 526 U.S. at 404–05).

Further, Appellant asserts, "Bedford had no idea [Appellant] was going to submit an invoice to him and no idea what the invoice was so there could not have been a quid pro quo." Appellant's Reply Br. 11. But Appellant cites no authority for the proposition that the payor must know in advance that a public official intends to solicit a bribe in order to form a quid pro quo. In any event, contrary to Appellant's assertion, Bedford testified that he knew *exactly* what the invoice was when it arrived -- a fake invoice requesting payment in exchange for receiving data migration support work. A quid pro quo.

c.

Appellant's remaining arguments as to whether there was a quid pro quo fare no better. Appellant asserts the following: he "had no criminal intent in recommending Bedford['s] Images for the data migration contract," Appellant's Br. 43; "[t]here was no discussion, agreement or understanding between Bedford and [Appellant] that [Appellant] would recommend Bedford['s] Images for the project or that [Appellant] would be paid for the recommendation," *id.*; Appellant "never gave Bedford any reason to believe that the invoices to Team America and continued work by Bedford['s] Images on the data migration project were tied together," *id.* at 44; and Appellant thought Bedford's Images and Team America were separate companies, and "had [he] expected to receive monies from Bedford['s] Images for recommending the project, he would have given the invoices to Bedford['s] Images," *id.* Considering the totality of evidence

16

presented, which must be viewed in the light most favorable to the Government, none of these assertions serve to undermine the jury's verdict. Although Appellant disagrees with the jury's factual findings, a rational jury "could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Collins*, 412 F.3d 515, 519 (4th Cir. 2005), that is, that Appellant conspired to engage, and engaged in, a corrupt quid pro quo with Bedford.[6]

2.

Official Act

To convict Appellant of bribery and conspiracy to commit bribery, the jury had to conclude that Appellant engaged in an "official act." But Appellant asserts that there was insufficient evidence for the jury to find that he performed an "official act" pursuant to 18 U.S.C. § 201. As defined in § 201:

> [T]he term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

---

[6] For the first time in his reply brief, Appellant asserts that Bedford's payments were not a bribe but an "illegal gratuity": "[A]ppellant's invoices submitted after completion of the first subcontract was a request for a gratuity. The payment by Bedford, who was grateful for the subcontract and who wanted to assist [Appellant] who was like family to him, was a gratuity or in Bedford's words, 'a loan.'" Appellant's Reply Br. 12–13. However, we decline to address arguments raised for the first time in the reply brief, and we express no opinion on the merits of this argument. *See Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001) (per curiam) ("The fact that [the appellant] pursues [an] issue in his reply brief does not redeem his failure to do so in the opening brief.").

18 U.S.C. § 201(a)(3). In *McDonnell*, the Supreme Court clarified that not every action that an official takes while in office qualifies as an "official act" for purposes of the bribery statute. Rather:

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so.

*McDonnell*, 136 S. Ct. at 2371–72.

Significantly, however, the accused public official need not have final or direct authority over the matter in question for the official's conduct to constitute an official act. As the Supreme Court explained:

> [A] decision or action to initiate a research study -- or a decision or action on a qualifying step, such as narrowing down the list of potential research topics -- would qualify as an "official act." A public official may also make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy" by using his official position to exert pressure on *another* official to perform an "official act." In addition, if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an "official act" by another official, that too can qualify as a decision or action for purposes of § 201(a)(3).

*McDonnell*, 136 S. Ct. at 2370 (emphasis in original).

18

Appellant asserts that he did not have authority to perform an official act, since he "was several steps removed from being influential in the process for awarding the contract for the data migration project" and he "had no idea or influence over which firm SPAWAR would award the data migration project." Appellant's Br. 42.

a.

Pursuant to *McDonnell*, the first question is whether there was a specific and focused "question, matter, cause, suit, proceeding or controversy" that involved a formal exercise of governmental power that is "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." 136 S. Ct. at 2371– 72. The specific matter in this case was the government contract for the data migration project, and the decision by SPAWAR -- a governmental agency -- to award money to Bedford's Images to complete the data migration project was "undoubtedly the 'formal exercise of government power.'" *United States v. Repak*, 852 F.3d 230, 253 (3d Cir. 2017) (quoting *McDonnell*, 136 S. Ct. at 2372). "The awarding of a [government] contract is not only akin to an agency determination -- it *is* an agency determination." *Id.* (emphasis in original). By the same token, maintaining the contract throughout the data migration project was a formal exercise of government power.

b.

The remaining question per *McDonnell* is whether Appellant "ma[de] a decision or t[ook] an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree[d] to do so." *McDonnell*, 136 S. Ct. at 2372. In *McDonnell*, the Supreme Court concluded that a public official (in that case, the Governor of Virginia) accepting items of

19

value in exchange for "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so) -- without more -- does not fit th[e] definition of 'official act,'" because the official did not make a decision or take an action *on* the question or matter. *Id.* at 2372. Appellant asserts that his conduct in recommending Bedford's Images for the contract was "akin to McDonnell's actions expressing support for a research study." Appellant's Br. 47.

Implicit in Appellant's argument is the suggestion that facilitating the award of government contracts -- and then maintaining those contracts -- is not a decision or action "on" a question or matter. The Third Circuit persuasively rejected this notion in *United States v. Repak*. Here, as in *Repak*,

> [Appellant] had the power to, and indeed did, make recommendations to [SPAWAR] as to the contractors it hired for projects. The evidence was sufficient for the jury to conclude that he accepted [items of value] knowing that he was to use his power, i.e., the ability to provide advice, to influence [SPAWAR's] awarding of contracts. . . . Therefore, the facilitation of the award of [government] contracts is an "official act" as defined by *McDonnell*.

*Repak*, 852 F.3d at 254 (citation omitted).

c.

The jury could reasonably infer from the evidence that Appellant facilitated the initial contract award in Bedford's favor with the specific intent to later solicit a bribe from Bedford, both in exchange for the initial contract award *and* for continuing to act in Bedford's favor throughout the life of the data migration project. But even if Appellant's conduct facilitating the initial contract award alone cannot form the basis for his bribery

20

conviction because that contract was awarded before he solicited the bribe, Appellant continued to send fake invoices while actively maintaining Bedford's contract award, and even sought and obtained approval to extend the contract to Bedford's Images. Thus, Appellant performed subsequent official acts -- most significantly, seeking and obtaining authorization to award additional funds to Bedford's Images -- while receiving Bedford's payments. These actions alone are sufficient to support the jury's verdict.

Accordingly, the jury's verdict was based on substantial evidence.

## C.

### Sentencing Enhancement

In determining Appellant's applicable guideline range at sentencing, the district court applied a four-level enhancement pursuant to U.S.S.G. § 2C1.1(b)(3). This section provides, in relevant part, "If the offense involved . . . any public official in a high-level decision-making or sensitive position, increase by 4 levels." U.S.S.G. § 2C1.1(b)(3). Appellant maintains that this enhancement was improperly applied to him.

Application Note 4 to § 2C1.1 defines "high-level decision-making or sensitive position" as "a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." U.S.S.G. § 2C1.1 app. n.4(A). It goes on to explain, "Examples of a public official in a high-level decision-making position include a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority." *Id.* at n.4(B).

Appellant asserts that this enhancement was not applicable to him because he did not hold a high-level decision-making position. Specifically, Appellant contends that he was in a "mid-level position[]" within the Commerce Department, did not have direct decision-making authority, and had no input into the decision-making process at SPAWAR or Tridea. Appellant's Br. 35–36. The Government counters that Appellant, at the least, exercised "substantial influence" over the decision-making process because he "wielded almost total de facto control over the data migration project." Gov't's Br. 41 (internal quotation marks omitted). Because the arguments the parties raise are factual in nature, we review this argument for clear error. *See United States v. ReBrook*, 58 F.3d 961, 969 (4th Cir. 1995) (reviewing decision to apply the enhancement for clear error because it "turns primarily on fact"), *abrogated on other grounds by Neder v. United States*, 527 U.S. 1 (1999), and *United States v. O'Hagan*, 521 U.S. 642 (1997); *cf. United States v. Matzkin*, 14 F.3d 1014, 1021 (4th Cir. 1994) (reviewing district court's finding that defendant held a "sensitive position" for clear error).

As Appellant himself described, his position within BIS vests him with decision-making authority:

> I have oversight for the all [sic] BIS networks, stand alone systems, desktop applications as well as the system security to include operational security, the security operations center, and the FISMA[7] reporting. Additionally I am responsible for all aspects of the System and Security engineering. This includes the design, development, testing, documentation and implementation of all IT related products.

---

[7] Federal Information Security Management Act

. . .

> My current job as described above is equivalent to three full time directors at the department level. In no other organization in the Department of Commerce is a single IT person responsible for the systems security, operational security, daily operations, and engineering tasks. . . . In addition to the specific technical tasks and FISMA work, I still have the responsibility of directly managing 7 [employees] and indirectly managing approximately 20 contractors. This equates to over 50% of all OCIO staff resources.

J.A. 1143–45. As for the data migration project specifically, during the investigation of this case, Appellant also told a special agent that it was "his decision" to award the data migration project to Bedford's Images. *Id.* at 593. The record also demonstrates that Appellant had "[t]otal control" of the project, *id.* at 396, short of awarding contracts.

Moreover, although Appellant did not have independent authority to award the contract, the record reflects that as the official leading the data migration project, Appellant's recommendation of who should win the contract was given substantial deference. *See* J.A. 457 ("[Government Attorney:] Mr. Bryant, why did you hire Bedford's Images? [Bryant:] I was directed to by [Appellant]."). Indeed, there is no evidence in the record that any of the individuals who passed along Appellant's recommendation did *any* research into Bedford's Images whatsoever, and instead simply relied on Appellant's recommendation since he was the project manager for the data migration project. Accordingly, the evidence demonstrates that Appellant had, at the very least, "substantial influence" over the decision-making process at issue here. Thus, the district court did not clearly err in finding that Appellant was in a high-level decision-

making position for the purposes of awarding and maintaining the data migration contract.

III.

For the foregoing reasons, we affirm Appellant's convictions and sentence.

*AFFIRMED*